UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

ECOLOGICAL RIGHTS FOUNDATION,

Plaintiff,

vs.

PACIFIC GAS AND ELECTRIC COMPANY and PACIFIC BELL TELEPHONE COMPANY,

Defendants.

Case No: C 09-03704 SBA

**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS**

Docket 49, 52

Plaintiff Ecological Rights Foundation ("Plaintiff") brings the instant action against Defendants Pacific Gas and Electric ("PG&E") and Pacific Bell Telephone ("Pacific Bell") alleging that their wooden utility and telephone poles, respectively, are discharging a toxic chemical, pentachlorophenol, into the environment in violation of the Clean Water Act ("CWA" or "Act"), 35 U.S.C. § 1251, et seq., and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, et seq. The parties are presently before the Court on PG&E and Pacific Bell's separate motions to dismiss the Second Amended Complaint ("SAC"), pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS Defendants' motions for the reasons set forth below. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed. R. Civ. P. 78(b), Civ. L.R. 7-1(b).

## I. BACKGROUND

PG&E is an electrical utility and Pacific Bell is a telephone service provider, which operate in Alameda, Contra Costa, Marin and San Francisco Counties. SAC ¶ 12. Both use wooden poles ("Pole" or "Poles") which suspend power and/or communications wires as part of their operations in the aforementioned areas. Id. The Poles are pressure-treated with an oil-pentachlorophenol preservative mixture. Id.; see also Showalter Decl. Ex. A at 69646, Dkt. 52-2. According to Plaintiff, over time, rain causes this mixture to leak "onto whatever surface the Pole contacts." Id. ¶ 13. In addition, the chemical mixture "oozes" to the surface and "is washed off the Pole by rainwater," thereby contaminating the San Francisco Bay, its tributaries and adjacent wetlands. Id.

On June 4, 2009, Plaintiff, a non-profit public benefit corporation that focuses on ameliorating toxic pollution, sent PG&E a letter entitled Notice of Violations of Federal Law and Notice of Intent to Begin Citizen Enforcement Action. Showalter Decl. Ex. B. The letter advised PG&E of its alleged violations of the CWA and RCRA caused by the use of the oil-pentachlorophenol mixture on Poles "located in San Francisco, Alameda, Contra Costa, and Marin Counties…." Id. at 6. The letter included a non-exhaustive list of Poles in dispute and dates of the alleged violations. Id. (Exs. A-C to letter).

On August 13, 2009, Plaintiff commenced the instant action against PG&E alleging two claims for relief based on violations of the CWA. Dkt. 1. Plaintiff filed a First Amended Complaint ("FAC") against PG&E on September 13, 2009, which added a RCRA claim. Dkt. 7. Before PG&E's response to the FAC was due, Plaintiff served a second notice letter, dated October 14, 2009, on PG&E and various others, identical in substance to the June 4 letter. Showalter Decl. Ex. C at 2 & n.1. PG&E and the other entities were alleged to be members of the Northern California Joint Pole Agreement ("JPA"). Id. By letter, dated January 5, 2010, Plaintiff sent a third notice to over ninety parties, including PG&E and Pacific Bell. Id. Ex. C.

On February 4, 2010, PG&E filed a Motion to Dismiss First Amended Complaint for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1).

Dkt. 26. Among other things, PG&E argued that Plaintiff's June 2009 notice was deficient because it did not specify the location of each Pole at issue. In its order denying PG&E's motion to dismiss, the Court found that PG&E had failed to cite any authority requiring that particular level of specificity. See Ecological Rights Found. v. Pac. Gas & Elec., C 09-3704 SBA, 2010 WL 1881595, at *3 (N.D. Cal. May 10, 2010). To the contrary, the Court found that "Plaintiff has provided more than sufficient information for PG&E to ascertain which poles are involved in this action." Id.

On June 21, 2010, Plaintiff filed a SAC, making substantially the same allegations as the original complaint, but now joining Pacific Bell as a defendant along with PG&E. Dkt. 45. The SAC alleges three claims for relief: (1) violation of the CWA, 33 U.S.C. § 1311(a); (2) violation of the CWA, 33 U.S.C. §§ 1311(a), 1342; and (3) violation of RCRA, 42 U.S.C. § 6972(a)(1)(B).

Both Pacific Bell and PG&E have now filed separate, albeit largely identical motions to dismiss. Dkt. 49, 52. As a threshold matter, PG&E again contends that the Court lacks subject matter jurisdiction on the ground that Plaintiff's notice letters are deficient. In addition, both Defendants challenge the legal sufficiency of each of Plaintiff's three claims for relief. In particular, they contend Plaintiff's claims under the CWA fail on the grounds that there is no discharge from a "point source," and because the alleged discharges are not associated with "industrial activity." Finally, Defendants argue that Plaintiff's third claim under RCRA fails on the ground that Plaintiff has not alleged the disposal of a "solid waste" as required by the statute. The Court addresses each of these issues in turn.

## II. LEGAL STANDARD

### A. RULE 12(B)(1)

A complaint may be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction. "A jurisdictional challenge … may be made either on the face of the pleadings or by presenting extrinsic evidence." Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003). In a "facial" challenge, the court assumes the truth of

plaintiff's factual allegations and draws all reasonable inferences in its favor. Doe v. Holy See, 557 F.3d 1066, 1073 (9th Cir. 2009). In the case of a "speaking" motion, the court is not restricted to the face of the pleadings and "may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988). In that case, "[i]t then becomes necessary for the party opposing the motion to present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction." Colwell v. Dept. of Health and Human Servs., 558 F.3d 1112, 1121 (9th Cir. 2009) (internal quotation marks and citation omitted). However, a facial attack need not be converted to a speaking motion where "the additional facts considered by the court are contained in materials of which the court may take judicial notice." Barron v. Reich, 13 F.3d 1370, 1377 (9th Cir. 1994) (citation omitted). "Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence." Rattlesnake Coalition v. EPA, 509 F.3d 1095, 1102 n.1 (9th Cir. 2007).

### B. RULE 12(B)(6)

A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). A complaint must allege "enough facts to state a claim to relief that is plausible on its face," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007), and "give the defendant fair notice of what ... the claim is and the grounds upon which it rests," Erickson v. Pardus, 551 U.S. 89, 93 (2007) (internal quotation marks omitted). The Court "accept[s] as true all well-pleaded allegations of material fact, and construe[s] them in the light most favorable to the non-moving party." Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010). "If a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc., 806 F.2d 1393, 1401 (9th Cir. 1986).

## III. DISCUSSION

### A. PRE-LAWSUIT NOTICES

The CWA and RCRA allow "citizen suits" against alleged polluters, provided that the plaintiff has first provided specific notice of the violation to the responsible party and the relevant agencies. The CWA requires sixty days notice, 33 U.S.C. § 1365(b), while RCRA requires ninety days notice, 42 U.S.C. § 6972(b). The requisite contents of the notice are set forth in regulations promulgated by the Environmental Protection Agency ("EPA"). The CWA regulations provide that:

> (a) Violation of standard, limitation or order. Notice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a). RCRA's notice provision is worded almost identically. 40 C.F.R. § 254.3(a). The purposes of the notice requirement are to provide an alleged violator with the opportunity to negotiate a resolution to the dispute, and to afford state and federal agencies the opportunity to enforce their laws and regulations. See Wash. Trout v. McCain Foods, Inc., 45 F.3d 1351, 1354 (9th Cir. 1995). Compliance with these notice provisions is a jurisdictional prerequisite to filing suit. Id. at 1354-55.

PG&E first argues that Plaintiff's notice letters are deficient because they do not specifically identify the location of each Pole. As PG&E concedes, however, the Court previously considered and rejected this contention in its Order denying PG&E's motion to dismiss the FAC. See Ecological Rights Found., 2010 WL 1881595, at *3.[1] As explained in that ruling, PG&E has failed to present any compelling authority demonstrating that such level of specificity is required to comport with the pre-lawsuit notice requirement under the CWA or RCRA. Ecological Rights Found. v. Pac. Gas & Elec., C 09-3704 SBA, 2010 WL

[1] PG&E acknowledges as much, but claims it is asserting the same arguments in order to preserve them for appeal. PG&E Mot. at 19 n.11, Dkt. 52.

1881595, at *3. In addition, the notice letter contained more than sufficient information for PG&E to determine which Poles are in dispute. In its current motion, PG&E has not presented any compelling reason for the Court to reconsider that ruling. Nor does the Court find persuasive PG&E's new argument that Plaintiff cannot rely on a third notice to cure deficiencies in its original notice or to supplement its claims by including Poles treated with any chemical, as opposed to the oil-pentachlorophenol mixture. PG&E's Mot. at 23. With respect to the first point, there are no deficiencies in the prior notices that need to be cured. As to the latter contention, the claims in the SAC are based solely on Poles treated with the oil-based pentachlorophenol mixture, as opposed to Poles treated with any chemicals. SAC ¶¶ 2-3, 12, 13, 19. In sum, the Court finds no merit to PG&E's challenge to the adequacy of Plaintiff's pre-lawsuit notices, and therefore, DENIES its motion to dismiss for lack of jurisdiction. The Court now turns to the claims alleged in the SAC.

**B. CWA**

**1. Overview**

The Federal Water Pollution Control Act of 1972, now known as the Clean Water Act, is a "comprehensive water quality statute designed 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" PUD No. 1 of Jefferson Cnty. v. Wash. Dept. of Ecology, 511 U.S. 700, 704 (1994) (quoting 33 U.S.C. § 1251(a)). Among the Act's goals is to eliminate "the discharge of pollutants into the navigable waters" of the United States. 33 U.S.C. § 1251(a)(1). To that end, "[t]he CWA generally prohibits the 'discharge of any pollutant,' … *from a 'point source'* into the navigable waters of the United States." Defenders of Wildlife v. Browner, 191 F.3d 1159, 1163 (9th Cir. 1999) (emphasis added, citations omitted). A party seeking to discharge pollutants into navigable waters must first obtain a permit to do so pursuant to the National Pollutant Discharge Elimination System ("NPDES"), as set forth in section 402 of the CWA. See 33 U.S.C. § 1342(a); S. Fl. Water Mgmt. Dist. v. Miccosukee Tribe of Indians, 541 U.S. 95, 102 (2004). "The NPDES permitting program is the 'centerpiece' of the Clean Water Act and the primary method for enforcing the effluent and water-quality

standards established by the EPA and state governments." Nat. Res. Defense Council, Inc. v. Cnty. of Los Angeles, -- F.3d --, 2011 WL 815099, at *9 (9th Cir. Mar. 10, 2011).

The CWA distinguishes between point and nonpoint sources. See Or. Natural Desert Ass'n v. U.S. Forest Serv., 550 F.3d 778, 780 (9th Cir. 2008) ("The CWA's disparate treatment of discharges from point sources and nonpoint sources is an organizational paradigm of the Act."). A point source is defined as "*any discernible, confined and discrete conveyance*, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14) (emphasis added). All other sources of pollution are characterized as "nonpoint sources." See Or. Natural Res. Council v. U.S. Forest Serv., 834 F.2d 842, 849 n.9 (9th Cir. 1987). An NPDES permit is required for discharges from point sources, but not for nonpoint sources. See League of Wilderness Defenders v. Forsgren, 309 F.3d 1181, 1183 (9th Cir. 2002) ("Point source pollution is distinguished from 'nonpoint source pollution,' which is regulated in a different way and does not require [an NPDES] type of permit.").

Originally, the EPA attempted to exempt stormwater discharges from the NPDES program; however, in 1977, the EPA's exemptions were found unlawful. See Natural Res. Def. Council v. Costle, 568 F.2d 1369, 1379 (D.C. Cir. 1977).[2] Following the D.C. Circuit's decision, the EPA promulgated regulations governing storm water discharges. See Natural Res. Def. Council v. EPA, 966 F.2d 1292, 1295 (9th Cir. 1992). "Recognizing both the environmental threat posed by storm water runoff and EPA's problems in implementing regulations, Congress passed the Water Quality Act of 1987 containing amendments to the CWA … portions of which set up a new scheme for regulation of storm water runoff." Id. (footnotes omitted); see also Northwest Envtl. Def. Ctr. v. Brown, 617

[2] Under EPA regulations, "Storm water means storm water run off, snow melt runoff, and surface runoff and drainage." 40 C.F.R. § 122.26(b)(13). Storm water runoff is not inherently a nonpoint or point source of pollution. Northwest Envtl. Def. Ctr. v. Brown, 617 F.3d 1176, 1182 (9th Cir. 2010) ("Brown").

F.3d 1176, 1193 (9th Cir. 2010) (noting that the 1987 amendments implemented a two-phase regulatory approach "to deal specifically with stormwater discharges."). "In § 402(p) [of the CWA], adopted as part of the 1987 amendments, Congress required NPDES permits for the most significant sources of stormwater pollution under so-called 'Phase I' regulations." Id.[3] These amendments, codified at 33 U.S.C. § 1342(p), require NPDES permits for stormwater discharges, inter alia, "associated with industrial activity," for stormwater discharges from municipal storm sewer systems, and for stormwater discharges that contribute to water quality violations or are otherwise "significant contributor[s] of pollutants." 33 U.S.C. § 1342(p)(2)(B) & (E).

**2. Point Source Discharge**

In its first claim for relief, Plaintiff contends that Defendants violated the CWA, 33 U.S.C. § 1311(a), by discharging chemical pollutants without an NPDES permit authorizing "storm water pollutant discharges from the Poles into the waters of the United States." SAC ¶ 46. Similarly, in its second claim, Plaintiff alleges that Defendants "[failed] to apply for and obtain an NPDES permit" in violation of the CWA and its implementing regulations. Id. ¶ 54. The threshold issue central to both claims is whether the Poles qualify as a point source subject to the Act.

Plaintiffs and Defendants each cite the Ninth Circuit's decision in Brown in support of their respective positions. In Brown, the Ninth Circuit held that rainwater runoff flowing from "logging roads [which] were designed and constructed with systems of ditches, culverts, and channels that collect and convey stormwater runoff" qualified as a "point source discharge for which an NPDES permit is required." 617 F.3d at 1179, 1198. In reaching this conclusion, the court focused on the manner in which the pollutants make their way into the waterway. The court explained that "[storm water run off] is a nonpoint or point source under § 502(14) *depending on* whether it is allowed to run off naturally (and

[3] "In 1990, EPA promulgated 'Phase I' regulations for the storm water discharges specified in § 402(p)." Id. All remaining stormwater discharges are covered by Phase II regulations. Id.

is thus a nonpoint source) *or* is collected, channeled, and discharged through a system of ditches, culverts, channels, and similar conveyances (and is thus a point source discharge)." Id. at 1182 (emphasis added).

Applying the distinction between point and nonpoint discharges, as summarized above, the Brown court acknowledged that pollution left on a roadway (i.e., rubber tire residue, copper dust from brake linings, etc.) which makes its way into waterways naturally when it rains presents a case of "nonpoint source pollution." Id. at 1182. Conversely, storm water which runs off from a surface *is* a point source discharge "*when* it is channeled and controlled through a 'discernable, confined and discrete conveyance' in a system of ditches, culverts, and channels." Id. at 1190 (emphasis added). In the case of the logging roads at issue, the court emphasized that they were "designed and constructed with systems of ditches, culverts, and channels that collect and convey stormwater runoff" into adjacent rivers. Id. at 1179. Because the logging roads were designed and constructed specifically to work in tandem with these drainage systems, the stormwater runoff from the road qualified as a point source discharge under § 1362(12)(A). Id. at 1190-91.

Here, the pleadings allege that rain causes the oil-pentachlorophenol mixture to wash off of the Poles, and that contaminated rainwater is then "carried by storm water runoff … from the Poles to San Francisco Bay, its tributaries and adjacent wetlands." SAC ¶ 13. These allegations, accepted as true, fail to establish a point source discharge actionable under the CWA. Unlike the logging roads at issue in Brown which were connected to a drainage system specifically designed and constructed to work the roads, the chemical pollutants are alleged to wash off the Poles and to eventually make their way to the San Francisco Bay through natural means that are separate and distinct from the Poles. That distinction is critical. "Stormwater that is not collected or channeled and then discharged, but rather runs off and dissipates in a natural and unimpeded manner, is *not* a discharge from a point source as defined by § 502(14)." Brown, 617 F.3d at 1181 (emphasis added); see also Greater Yellowstone Coal. v. Lewis, 628 F.3d 1143, 1153 (9th Cir. 2010) ("The text of § 401 [of the CWA] and the case law are clear that some type of collection or

channeling is required to classify an activity as a point source."); Trustees for Alaska v. EPA, 749 F.2d 549, 558 (9th Cir. 1984) ("[P]oint and nonpoint sources are not distinguished by the kind of pollution they create or by the activity causing the pollution, but rather by whether the pollution reaches the water through a confined, discrete conveyance."). Thus, the Court concludes that Plaintiff has failed to state a claim under 33 U.S.C. §§ 1311(a) or 1342.[4]

**C. RCRA**

"RCRA's primary purpose . . . is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" Meghrig v. KFC W., Inc., 516 U.S. 479, 483 (1996) (quoting 42 U.S.C. § 6902(b)). To further this goal, § 7002 of RCRA permits "any person" to bring a civil action against "any person … who has *contributed or who is contributing to* the past or present handling, storage, treatment, transportation, or *disposal* of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment…." 42 U.S.C. § 6972(a)(1)(B) (emphasis added). "Hazardous waste" is defined as "a *solid waste*, or combination of solid wastes, which ... may ... pose a substantial present or potential hazard to human health or the environment *when improperly treated, stored, transported, or disposed of, or otherwise managed*." 42 U.S.C. § 6903(5)(B) (emphasis added).

The salient issue presented is whether the chemical preservatives used on the Poles qualify as "solid waste" within the meaning of RCRA. The term "solid waste" is statutorily

---

[4] Alternatively, Defendants argue that Plaintiff's CWA claims fail on the ground that the Poles are not "associated with industrial activity," and therefore, are beyond the purview of the statute. As noted, under the CWA, NPDES permits are required for stormwater discharges, inter alia, "associated with industrial activity." 33 U.S.C. § 1342(p)(2). However, the Court need not reach this issue because the lack of a point source discharge is, standing alone, fatal to Plaintiff's CWA claims.

defined as "discarded material." 42 U.S.C. § 6903(27).[5] Though not defined by statute, EPA regulations specify that "discarded material" includes any material that is "[a]bandoned." 40 C.F.R. § 261.2(a)(2). The regulations state further that material is "abandoned" if it is "being disposed of" or if it is "being ... stored ... before or in lieu of ... being disposed of." 40 C.F.R. §§ 261.2(b)(1) & (3); see also 40 C.F.R. § 261.2(b)(1) (providing through the plain terms of EPA's regulations that "discarded material" refers to material "*being* disposed of[.]") (emphasis added). The Ninth Circuit has likewise held that "the verb 'discard' [as referenced in RCRA] is defined by dictionary and usage as to 'cast aside; reject; abandon; give up.'" Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1041 (9th Cir. 2004) ("Safe Air") (citation omitted). Agreeing with other circuits, the Ninth Circuit in Safe Air explained that RCRA "reveals [a] clear Congressional intent to extend EPA's authority only to materials that are truly discarded, disposed of, thrown away, or abandoned." Id. (internal quotations marks and citations omitted).

In its pleadings, Plaintiff alleges that solid waste is disposed of into the environment when the chemical preservatives "leak, spill and drip from the Poles" due to rain, and when "[d]ust impregnated [with the chemicals] … is blown into the air during dry seasons." SAC ¶¶ 19, 2. Plaintiff theorizes that once the chemicals leave the Poles, they no longer are being "used" by Defendant and thus should be deemed to be "disposed of" by them. Pl.'s Opp'n to Pac. Bell Mot. at 21, Dkt. 66. The flaw in Plaintiff's theory of disposal is that in this case, there is no allegation that Defendants engaged in any conduct that resulted in the discharge of the chemical preservatives. To the contrary, Plaintiff merely alleges that the purported contamination is the result of natural forces—namely, rain and wind. See SAC ¶¶ 19, 2. Such allegations, on their face, are insufficient to establish that Defendants engaged in the "disposal" of hazardous waste under § 6972(a)(1)(B).

[5] This provision states, in relevant part, that "[t]he term "solid waste" means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other *discarded material*, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities…." 42 U.S.C. § 6903(27) (emphasis added).

Plaintiff maintains that "[t]he *passive* spilling or leaking of materials from a place of containment into the environment constitutes 'disposal' of solid waste." Pl.'s Opp'n at 21, Dkt. 66 (emphasis added). As support, Plaintiff cites Zands v. Nelson, 779 F. Supp. 1254 (S.D. Cal. 1991), which found that "leakage of gasoline from an underground storage tank can create a cause of action under section 6972(a)(1)(B)." Id. at 1261. In reaching that conclusion, the court reasoned that once gasoline leaks out of the tank and contaminates the soil, it no longer is "useful"—and hence, becomes "discarded material" within the meaning of RCRA. Id. at 1262. "As a result, it must be said that the gasoline has been abandoned via the leakage (even if unintentional) into the soil." Id. But Zands is inapposite for at least two reasons. First, Zands was decided prior to Safe Air which, as discussed, implicitly rejects the notion that the hazardous material can be "discarded" without any action by the defendant. Safe Air, 373 F.3d at 1042; cf., Sycamore Indus. Park Assocs. v. Ericsson, Inc., 546 F.3d 847, 853-54 (7th Cir. 2008) ("By definition, the phrase 'has contributed or is contributing' requires affirmative action. The vast majority of courts that have considered this issue read RCRA to require affirmative action rather than merely passive conduct…."). [6]

Second, Zands is distinguishable on its facts. In Zands, plaintiff's RCRA claim arose from the leakage of gasoline from storage tanks. Subsequent to Zands, the Ninth Circuit rendered its decision in Carson Harbor Village v. Unocal Corp., 270 F.3d 863 (9th Cir. 2001) (en banc), which considered whether the passive migration of contaminants

---

[6] While failing to address Safe Air in either of its opposition briefs, Plaintiff attempts to distinguish Sycamore on the ground that the court was addressing the "contributing to" aspect of RCRA's citizens suit provision, as opposed to what constitutes a "disposal" of hazardous material. Pl.'s Opp'n at 22. This contention is unpersuasive. As noted, RCRA allows a private citizen to file suit against any person "who has *contributed or who is contributing to* the past or present handling, storage, treatment, transportation, or *disposal* of any solid or hazardous waste…." 42 U.S.C. § 6972(a)(1)(B) (emphasis added). On its face, the terms "contributed or who is contributing to" refer to and are intertwined with the subsequently-referenced activities, i.e., "handling, storage, treatment, transportation, or disposal." Thus, the Sycamore court's determination that "'has contributed or is contributing' requires affirmative action," 546 F.3d at 854, applies with equal force to the expressly-stated activities, such as "disposal."

through soil constituted a "disposal" under CERCLA.[7] The court noted that although disposal could be shown by "leaking" and "spilling," neither term was germane under the facts presented. In particular, the court explained that the plain meaning of "leaking" requires that the material leak out of "[a] barrel or underground storage tank … or a vessel or some other container …." Id. at 879. Likewise, "spilling" connotes that the contaminant is "spilled out of or over" something, such as "a barrel or the spilling over of a holding pond." Id. Thus, even if Zands stands for the proposition that a passive discharge is actionable under RCRA, its ruling would be limited to cases where the discharge of hazardous waste leaked or spilled out from a container intended to hold the waste. That scenario is not presented here. The Poles are not containers; but rather, they are used to suspend wires for the transmission of electricity for PG&E and data for Pacific Bell. SAC ¶ 12.

At bottom, the Court finds that liability under RCRA § 7002 does not attach based on the "discharge" of chemical preservatives from the Poles attributable to natural forces, such as rain and wind. Were the Court to accept Plaintiff's interpretation of "discarded material," virtually any owner of any building or structure—from fences to park benches to houses—would be subject to liability. Such a result is clearly well beyond what Congress intended in enacting RCRA. Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's third claim for relief.

## IV. CONCLUSION

Plaintiff has failed to allege any cognizable violations of the CWA or RCRA. Because Plaintiff's theory of liability under the CWA and RCRA cannot be rectified by further amendment to the pleadings, the claims alleged in the SAC are dismissed without leave to amend. Accordingly,

---

[7] Although Carson Harbor involved CERCLA claims, CERCLA utilizes RCRA's definition of "disposal" as set forth at 42 U.S.C. § 6903(3). See Pakootas v. Teck Cominco Metals, Ltd., 452 F.3d 1066, 1077 n.17 (9th Cir. 2006).

IT IS HEREBY ORDERED THAT Defendants' motions to dismiss are GRANTED. The Clerk shall close the file and terminate any pending matters. Judgment shall be entered in favor of Defendants.

IT IS SO ORDERED.

Dated: March 31, 2011

SAUNDRA BROWN ARMSTRONG
United States District Judge